Good morning. We have four argued cases this morning. The first of these is number 2011-1572, METSO MINERALS v. POWERSCREEN. Mr. Trembath, is that how you pronounce it? That's correct, Your Honor. May it please the Court, Vincent Alfieri is here representing Terex as well. Notwithstanding the volume of the appendix, this case is relatively simple. The District Court made two erroneous instructions to the jury and construed two claims erroneously and denied Terex its opportunity to have a jury decide whether it infringed or not. I'd like to begin by discussing willfulness followed by the claim construction issues and following that with 103 and the alternative issue. In this case, the District Court gave the jury a jury instruction based on underwater devices, the due care standard. That standard was rejected by this Court in Seagate. The District Court's instruction was prejudicial. The jury could not have decided whether POWERSCREEN's infringement was willful under the objective analysis articulated in Seagate because it had been given the wrong jury instruction. The error had a significant impact on this case. Based on the jury's finding of willful infringement, the District Court doubled damages to about $50 million. You're referring to the jury instruction on due care, on the due care standard that was issued? Yes, Your Honor. At Metso's suggestion, the District Court after trial recognized that it had given an erroneous jury instruction and tried to do an objective prong analysis under Seagate in its post-trial orders. At Metso's suggestion, it incorporated a subjective analysis into what should have been otherwise an objective analysis. It required POWERSCREEN to show that it knew at the time of its alleged infringement of the objectively reasonable defenses. That takes the analysis out of the objective realm and puts it into the subjective. Let's talk a bit about the underlying merits issues here, which also bear on the willfulness issue. On the obviousness question, I've read the record and it seems to me that the pre-verdict J. Maul with respect to obviousness went only to the issue of secondary considerations, but that with respect to the post-verdict J. Maul, the District Court seemed to think that that was not a barrier to addressing the question of obviousness as a whole. Am I correct about that? Yes, Your Honor. And is your contention that because the District Court in the post-verdict J. Maul addressed the question of obviousness as a whole, that that issue is preserved for appeal? In other words, that you argue here that we should find as a matter of law that this was obvious, right? Yes, Your Honor. The District Court, when Power Screen was making its objections, or I'm sorry, its pre-verdict J. Maul motions, the Court made it clear that obviousness was going to the jury. Metzl's counsel understood that obviousness was going to the jury. The standard is relatively low when you know that the issue is going to the jury. There was no, it would have been counterproductive for Power Screen to have continued to badger the Court on obviousness. It knew obviousness was going to the jury. I believe Metzl objected in its post-trial motions and said that the issue had been waived. The Court didn't think, the trial court did not think the issue had been waived. Moreover, there was an erroneous jury instruction given on obviousness. But you're arguing that quite apart from the jury instruction, we should find as a matter of law that this claimed invention is obvious, right? That's correct. And that's based on two pieces of prior art, as I understand it? That's correct, Your Honor. And what do those, the invention here relates to the folding of these conveyors, right? That's correct. Did the two pieces of prior art, when combined, show the folding in the same way as the claims here? If I might use my notebook as an example, the Dominator, one piece of prior art, the conveyor would be like this. In the operative position, in the transport position, the conveyor would fold up like this. This would be the tail section and this would be the head section. The master stock conveyor, the other piece of prior art... And is that the same way as the claimed invention here with respect to the tail piece? The only difference is, with respect to the invention, is that in the head section, instead of folding this way, folded this way. Okay? The master stock conveyor taught both methods of folding, taught that they were interchangeable. The master stock conveyor folded on itself like this and it also had a fold that went this way. Is that the side fold? Yes. And what about the secondary consideration? Well, the jury was not given any secondary considerations instructions for what that's worth. What was the evidence of secondary consideration? The evidence in the record is that there was copying by a power screen and by other screener makers in the industry. The evidence as far as the other screeners in the industry is wanting because there's no testimony or evidence that they actually did infringe what's claimed in the patent. All that's in evidence is a bunch of brochures. Commercial success, I believe, is argued. But what was the evidence that power screened copy? I mean, apart from the fact that the folding is done in the same way. Well, actually, the folding, if you step back at 40,000 feet, it looks like the folding is done in the same way. The folding is actually accomplished in a different way. The power screen device has two struts that hold the conveyor open, and those struts are attached to the frame. And one strut collapses, and that lets the conveyor fold. The patent doesn't have that. The patent has a ram between the head and tail section that lets the head fold relative to the tail. So they're not the same. There really wasn't copying as is normally thought of. It wasn't a replication, if you will, of what was claimed. Was there any evidence, any internal evidence that this had in fact been copied? Internal documents and things like that? No, Your Honor. No. Nope. The key thing when we're talking about 103 is, well, there was a motivation to make the device. One thing that is important and that is maybe lacking a little bit in the briefing, if I had, at the time, it was very important to keep a screener within 8'6", because if you're under 8'6", you didn't have to have a permit. You could travel on the road. You could travel on the road without a permit. And that was really important. 82, Joint Appendix 82 and 13-300 talk about how important that was. The inventor wanted to create a screener that could travel down the road and be compact enough that it wouldn't need a permit. Now, Metzos argue there's unexpected results. There are none. It's known that you can fold things up. The Pythagorean theorem has been around forever, which teaches you that you can make something longer if you put it in a triangular shape. And perhaps more importantly, Metzos argues that you get this increased 70% throughput by having these side conveyors folded the way they claim. Did any of the priorities, the 90-degree fold and the stopper, I guess I'm talking about the L-shaped fold. Right. The Zur reference, which was one of the references cited, or is cited on the face of the patent, has a 90-degree fold. And it has a stop. To finish the thought, there was nothing unexpected. It's pure math. At 36-15 and 16 are the images that show the calculated throughput. You calculate the area of a trapezoid and a circle segment. There wasn't anything unexpected that happened by the combination of the master stock conveyor and the dominator. What other secondary considerations did they allege were present here? Your Honor, I'm at a loss. I think I've articulated the ones that they've highlighted. And as in Anderson, BlackRock, and KSR, even if there are some secondary considerations, that's not enough to overcome the strong showing that the invention was obvious. Did you have expert testimony about the motivation to combine? Your Honor, I don't know. Can you comment on the piercing the corporate bill issue? And I'm interested on whether the affirmative defense against liability pursuant to piercing the corporate bill doctrine was waived or not. The way the corporate bail issue came up was at the close of plaintiff's case, Terex moved, that there wasn't any evidence that Terex infringed. That was appropriate. There was no evidence that Terex had infringed at that time. To suggest that there had been a waiver is interesting. They hadn't raised the piercing the corporate bail issue earlier? No, Your Honor. I don't believe it was called for. There was one set of interrogatories that asked for defenses. The response to that interrogatory clearly, the interrogatory was couched in terms of validity. Or non-infringement element by element. And the response was specific. The response to the interrogatory was specific. Clearly putting the plaintiff on notice that the response was limited to, I don't recall whether it was invalidity or non-infringement. There was nothing that called for any suggestion that... No, but what I'm asking is whether the plaintiff raised the piercing the corporate bail thing. No, Your Honor. When did they first raise that? They raised, the plaintiff raised it, or it became an issue after defendants indicated that plaintiff had not put on, or moved, that plaintiff had not put on evidence that Terex directly infringed, contributorily infringed. I see that my time is up. Well, you're in your bubble now. You want to save it? I do want to save my rebuttal. Good morning, Your Honor. My name is Lisa Ferrari. We both went to trial today. I'll address the issues, if you'd like, the ones that you raised in questioning first. You asked about obviousness and whether the plaintiffs, the defendants, waived any challenge to the basic issue of obviousness. We say in our brief, obvious, yes, they did. The only emotion they made at the close of the case was that the patent, that the obviousness issue, secondary consideration... Yeah, I understand. Pre-verdict then. Pre-verdict. Post-verdict, they raised the broader question of obviousness. Post-verdict, and we raised it with... Don't interrupt me. Sorry. Post-verdict, they raised the broader question of obviousness, and the district court didn't suggest that there was a waiver. The district court went ahead and addressed that on the merits, right? Correct. This is, in general, what the district court did. The district court handled every issue that came before it and didn't want to preclude anyone from arguing anything so that we wouldn't have to have a second or third trial or something like that. So the district court did not address the issue of waiver, either of the general obviousness verdict or of the Terex Corporation piercing the corporate veil issue at all because we were all there, we had just gone through an 8-week trial, and the judge didn't want to reverse and say we have to have another trial. It was a very trying trial. We lost a few jurors during that time. But why isn't the evidence here on obviousness so compelling? Because... You have prior law that shows these features. It's just a question of combining those features into the patent of the bias, right? Well, you have to look at the evidence, the exact evidence. And we cross-examined their expert witness, and you asked during the previous question, was there any motivation to combine? I asked the witness that, and he had nothing. There was nothing. He could not say why you would want to pick this reference, why you'd want to put that reference, why you'd want to put the two references together, why you'd want to take certain parts of each device off and combine them in that certain way to get to the claimed invention without using hindsight. He had no answer for any of that.  We did not. We used their expert to go through these issues. And he was, to be very frank, not believable. His credentials were not believable. He had no experience in this particular field, and he could not explain how to combine these two other than say, well, if you look at the invention, if you put them together this way, this is what you get. Yeah, but we also have cases, and wires being an example, where we've said that you don't need expert testimony on this issue. If you have fairly simple technology, which this seems to be, you can look at the broad bars and make a determination as a matter of law about motivation to combine. There is law to that effect, yes. The problem is you also have to look, maybe you can get to a prima facie case of obviousness with the references. I don't think you do, because there is still no reason the conveyor patent, the master stock conveyor patent, it folded flat, completely flat. And there was no reason to keep it unfolded at 90 degrees. Other than looking at the patent invention, you say, oh, well that would be a great idea, let's do it that way. But this master stock conveyor, the way you transport it, you have the whole thing folded up and drag it down the road, all folded up flat, one conveyor next to the other, like a Z flattened out or an S flattened out. If you had one of the ends sticking out perpendicular, you'd be driving down the road like an airplane going down the road with wings. No one would want to do that. And to combine that master stock conveyor with the dominator, you would have to do something. And the something you would have to do was the inventiveness of this patent. What about secondary considerations? Well, the secondary considerations were absolutely compelling. First of all, PowerScreen testified at length about being the leader in the field for decades. They had a conveyor that folded. It folded once, just like that, a single fold. They used that for 10 years before our patent, our invention became commercially marketed. What is the point? The point is they failed to come up with our invention. If it was so obvious, how come they didn't come up with it? And then they copied it. There is absolutely evidence of copying. There are documents that showed. One of the men who was involved in the design of the infringing screener actually worked for our company. He was a draftsman. He was involved in designing parts for the patented machine. He quit and moved to their company. And when he was at their company, they actually said, what do you think about our new design? Do you think it infringes this patent? And he said, well, no, I don't think so. The problem was he never even read the patent. He just looked at an abstract of the patent. What does this have to do with copying? They copied. He was involved in the design. He knew of our patented invention. He knew of the patent. He knew of our commercial device. And he was involved in the design. That's the evidence of copying? Plus, it looks exactly the same. There are no internal documents that say, let's copy this, right? The document they have is, here's our design. How close does it come to the patent design? Well, in terms of deciding whether it was infringing. Yes. Yeah, but there's no document that says at the outset, let's copy their design, right? No, except that it was there. It was out in the market. They were very aware of what was out there in the market. The fact that something was out there in the market and people were aware of it doesn't show copying, does it? I think it does, based upon what the competition was. Their competition was, it just folded once. And suddenly, they see our machine and folds twice. It folded exactly the same way. Now, they say it gets from point A to point B when it folds in a different way. The claims don't talk about how it gets from point A, from folded to unfolded. So, it's not an exact copy of your commercial device? It's an exact copy in terms of the transport position and the operative position. How they got from one to the other is slightly different. Okay. Correct. So, what are the other, I'm sorry. So, your opponent brought up a prior art reference that taught the L-shaped fold. Can you address that? Yeah. It's interesting because it never came up at trial. This is a new argument on the appeal. At trial, they said it was two references, the dominator and the master stock conveyor. And now, with new lawyers, they have this third reference which they say is relevant. That reference, by the way, was cited during the prosecution of the patent in suit. And the examiner did not find it to be of relevance. But what's the answer on the merits as to whether it shows this L-shaped feature? It does not show the claimed feature of the patent because it folds in the center of the machine over the top of the machine. And ours does not fold in that way. So, no, it does not. And again, they have no testimony from their expert about that. And we had no notice at all of this argument until their appeal. I'm sorry. Isn't the point, though, that the prior art reference teaches folding or rather creating an L-shaped fold, it doesn't have to be exactly the same or result in the same appearance, just that the prior art, whether or not the prior art taught that the L-shaped fold existed. I'm sorry, I disagree with you. I think it does have to show the exact appearance because that's the point of these machines. They have these arms that go out to the side. And if you fold it off the back and over the top, it will not work. The whole point is so that you have three conveyors on these machines, one coming off the back and one coming off each of the sides. And it's a different idea what that other reference had. And again, it's something that was considered by the examiner already and not raised. And I would say it was a waived argument. They did not raise it during pretrial, during trial. And it's only during appeal that they raise it. So that's not the way things should work. On the other hand, you held the project not disclosed to the denominator or master stock. They went in for this patent. You mean disclose it to the patent office? Right. That's correct. But then you copied it. Make this invention. We didn't copy anything. We put a piece of this, a piece of that, came up with the invention. Well, no, I don't think that's correct. Well, that's how I see it. I mean, that's the argument of the whole case, I realize. But that's how I see it. I mean, what the district court response is about to say, just no, why not? Well, the dominator, it was another machine made by our company's predecessor. But the district court determined that it was cumulative of all the prior art that was before the patent office, as was the master stock conveyor, was cumulative of prior art before the patent office. So saying that these were withheld is irrelevant because it's not material prior art. It was already before the patent office. It was known. But that doesn't seem to address the invalidity question as to whether these pieces of prior art, when put together, created the patented invention and the existence of those early references rendered it obvious. It may be that there wasn't any impropriety involved here, any inexorable conduct, but you still have these prior art references that, if put together, create the patented invention. Well, I disagree that putting them together creates the patented invention. And, again, I will go to their expert who could not put on a case. And there are very strong secondary considerations, which this court and the district court did consider, which this court did not. Well, apart from alleged copying, what is there? Well, what else there is is commercial success. They sold 1,271 machines that infringe for sales of $160 million, and we sold 365 machines for $43 million. Well, what ties those sales to the future of the patented invention? Well, all of these machines by them infringe the patent. And our machines are covered by the patent. And their expert even said that it was covered by the patent. He admitted on cross-examination. Yeah, but that doesn't necessarily relate the patented feature to the success. I mean, did anybody testify the reason that these things sell well is because, unlike the prior art, they combine the features in a unique way, which has a particular appeal to the market? Is there any testimony like that? Yes, I believe there was testimony. I believe our damages expert testified at length about the sales, about what happened to sales before and after the new design, I believe. But was there a connection between the infringing feature and the increase in sales? Well, the feature that was folded up and over had great advantages, and those advantages were testified at length as to what made that, as to the fact that this made the product. Mechanically, I see the advantages, but was there a connection made between the infringing feature, the folding feature and the other features that have been asserted, and the commercial success? Was there a link made to that? I'm not sure how to make the link other than to say that these features were a big deal and customers found the features that… Were there customer surveys and evidence? There were no customer surveys, but there were… I'm blanking on what there were. I know our damages expert testified at length about the features and testified that these were important for sales and that it didn't cover up the motor, that it made the conveyors longer, and that customers wanted those features. As far as other secondary considerations, there were, in addition to Terex, there were four other companies that changed their design to this L-shaped design after our product came out. Making this design the industry standard. If there are no further questions… I have no further time, so if you have any more questions… Do you have a last thought? Well, my last thought is I think you should look at the evidence in the case and not listen to a lot of the… What I saw mostly in the PowerScreen and Terex briefs were legal arguments by lawyers and very little treatment of the evidence. And the evidence is very substantial on all the issues that are involved in this appeal and I urge you to look at the evidence and what supports it and affirm the decision below. Okay, thank you. Your Honors, I have a couple of points I'd like to make. At JA 16694, PowerScreen's expert is being questioned. Mr. Loffler, would you please explain to the jury how you would combine the Dominator, as shown in the photograph on the left, with all or part of the Master Stock 80 conveyor shown on the right to form the claimed invention of the 618 patent? Contrary to what I believe was represented, there was evidence about the combination of the two. This is your expert? It was our expert, yes. I would like to turn briefly to the alter ego issue. The alter ego issue is very important to every corporation that operates in the Second Circuit. It was so important that Terex hired Mr. Ferreri to represent them on the issue. And the judge had it wrong. He didn't let the issue go to the jury and it should have. There's some question about whether the issue was hidden somehow. If I might reference the court to JA 12972, the district court wrote, the defendants maintain, as they have from the beginning stages of this case, that the only connection Terex Corporation has to this case is that it is the corporate parent of the defendant Power Screen International. There were no surprises. From the beginning, as recognized by the district court judge, it was clear that Terex had no connection to this case other than through Power Screen. Counselor, looking at 35 U.S.C. Section 282, and this is speaking on patents and the presumption of validity for patents, under B, it says defenses. The following shall be defenses in any action involving the validity of an infringement of a patent and shall be pleaded. And the first one says non-infringement, absence of liability for infringement and unenforceability. Why shouldn't I read that to require that the affirmative defense of Pearson and Corporate Bell should not have been pled? If you'll check the footnotes that relate to the second prong, they relate to things like license, and this isn't a license case. Terex has taken the position from the beginning that it didn't infringe. It does not directly infringe. It cannot directly infringe. There's no allegation of induced infringement or contributory infringement. Terex simply does not infringe. Well, I guess what you're saying is there's no reason to pled that earlier since it only comes up, but the other side is trying to pierce the corporate veil, which is an unusual thing. Under their theory, whenever you have two corporations, apparently a subsidiary, you always have to plead no piercing of the corporate veil. But who brought up the issue of piercing the corporate veil? It was Terex, wasn't it? Terex moved at the close of the evidence and said, Your Honor, they have not put on evidence of us, Terex, infringing directly or contributorily. So then they're asserting an absence of liability. Why doesn't this statute apply? Again, the clause of the statute that's referenced, that METSO relies upon, relates to if Terex had a license. If Terex had had a license, it would have needed to have affirmatively pled that. There is no allegation that Terex had a license. My time is fast leaving. There's one issue that I would like to... I think, Mr. Tremuth, I think we're out of time. Thank you very much. Thank you. Thank you. Thank you.